**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ALAN JENKINS,

        Plaintiff,

        v.

CORNERSTONE RELOCATION GROUP, LLC,

        Defendant.

Civil Action No. 23-1755 (MAS) (JTQ)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

       This matter comes before the Court upon Defendant Cornerstone Relocation Group, LLC's ("Defendant" or "Cornerstone") Motion for Summary Judgment. (ECF No. 29.) Plaintiff Alan Jenkins ("Plaintiff") opposed (ECF No. 37), and Defendant replied (ECF No. 42). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons below, the Court denies Cornerstone's Motion for Summary Judgment.

## I.     BACKGROUND

       This action arises out of a dispute over Cornerstone's furlough and subsequent termination of Plaintiff from his employment. The material factual circumstances giving rise to this action, as revealed through discovery between the parties, are set forth in the submissions of Cornerstone and Plaintiff pursuant to Local Civil Rule 56.1. (*See* Def.'s Statement of Material Facts ("DSOF"), ECF No. 29-3; Pl.'s Counterstatement of Undisputed Material Facts ("PSOF"), ECF No. 37-1.)

A.    **Plaintiff's Employment at Cornerstone**

Plaintiff, a 67-year-old male, was hired by Cornerstone in 1977 as Vice President of Finance ("VPF").[1] (DSOF ¶ 3; PSOF ¶ 4.) Cornerstone[2] provides global relocation services to corporate clients and their employees, which include, among other things, tax and expense management, transportation of household goods, purchase and sale of real estate, and rental assistance. (DSOF ¶¶ 1-2.)

While employed by Cornerstone, Plaintiff held the professional designations of Certified Public Accountant, Certified Relocation Professional, and Global Mobility Specialist. (*Id.*) Plaintiff remained the VPF of Cornerstone until 2017. (PSOF ¶ 5.) In 2017, Plaintiff transitioned to the position of Vice President of Corporate Services ("VPCS"), which was considered a lateral move. (*Id.*) Throughout Plaintiff's employment, he reported to Janelle Piatkowski ("Piatkowski"), President and Chief Executive Officer of Cornerstone. (DSOF ¶ 4; PSOF ¶ 8.)

During Plaintiff's time serving as the VPF of Cornerstone, he had "performance issues over time" and would "lose control" of the day-to-day transactional activity. (DSOF ¶ 7.) Plaintiff also had issues with the timeliness of his work, requiring "extra management" and constant follow-up. (*Id.* ¶ 11.) Because of Plaintiff's performance issues, in 2017, Atlas requested that Piatkowski terminate Plaintiff's employment. (*Id.* ¶ 8.) Piatkowski, however, did not terminate Plaintiff's employment at that time. (*Id.* ¶ 9.) Rather, Piatkowski transitioned Plaintiff out of his role as VPF and into a "support role" for Cornerstone's expansion into the global market, which resulted in his position changing from VPF to VPCS. (*Id.* ¶ 10.) As VPCS, Plaintiff served as the main point of contact and relationship manager for Cornerstone's corporate services (contracts,

---

[1] Plaintiff was born in 1957. (DSOF ¶ 5.)

[2] Atlas World Group, Inc. ("Atlas") is the parent company of Cornerstone. (DSOF ¶ 1.)

legal liaison, risk management, privacy compliance, and facility management). (PSOF ¶ 6.) Additionally, Plaintiff's VPCS role supported various real estate projects and business continuity planning. (*Id.*)

Despite performance issues, Plaintiff has neither received substandard performance ratings or written discipline nor was he ever placed on a performance improvement plan. (*Id.* ¶¶ 11-12.) But, sometime after Plaintiff's transition to the VPCS role, Piatkowski assigned Deborah Frost ("Frost"), Senior Vice President, Global Services, to become involved in overseeing Plaintiff's day-to-day responsibilities, to ensure he was staying on task. (DSOF ¶ 12.) Plaintiff thereafter was responsible for completing and updating a weekly task list. (*Id.*)

**B.     Plaintiff's Health While Employed with Cornerstone**

In 2012, Plaintiff suffered a heart attack and was subsequently diagnosed with cardiovascular disease and was out of work for a week. (DSOF ¶¶ 14-15; PSOF ¶ 25.) Piatkowski was aware that Plaintiff suffered from this heart attack. (DSOF ¶ 16.) Others at Cornerstone also knew about Plaintiff's health issues, as he was open to people about it. (*Id.* ¶ 17.) Following his heart attack, Plaintiff was generally able to manage his symptoms with no impact on his ability to perform his job. (PSOF ¶ 26.)

In April 2021, Plaintiff experienced significant exacerbated cardiovascular issues. (DSOF ¶¶ 18-22; PSOF ¶ 27.) On April 27, 2021, Plaintiff formally notified, for the first time, Diana McIntire ("McIntire"), Vice President of Human Resources, Frost, and Piatkowski through an e-mail message that he was experiencing exacerbated symptoms. (PSOF ¶ 29.) McIntire informed Plaintiff that he would be able to take paid sick leave or FMLA leave.[3] (DSOF ¶ 18.) Prior to the

---

[3] Atlas generally handled all FMLA requests and benefits for Cornerstone's employees. (DSOF ¶ 13.)

April 27, 2021 e-mail message, Cornerstone was unaware of Plaintiff's exacerbated disability symptoms and the "frightened" health situation that he suddenly faced. (PSOF ¶ 31.) Then, on April 29, 2021, Plaintiff advised McIntire via e-mail message that he was going to be hospitalized overnight due to the exacerbated symptoms. (DSOF ¶ 21.) McIntire replied that she "added NJ Sick . . . and . . . approve[d] it. [Also, she] w[ould] let Atlas know that [he was] in hospital overnight and he could decide on [Family Medical Leave Act] [']FMLA['] when [he was] able." (*Id.*)

On April 30, 2021, McIntire exchanged several e-mail messages with Atlas's human resources department concerning Plaintiff's potential FMLA status in light of his recent health concerns. (PSOF ¶ 35.) Shortly after, Atlas provided Plaintiff blank FMLA forms (DSOF ¶ 23), and Plaintiff subsequently submitted the completed FMLA forms on May 6, 2021 requesting retroactive FMLA and intermittent FMLA leave (DSOF ¶ 24).

Plaintiff's FMLA application completed by his physician, Andrew T. Matthews, M.D., described his serious health condition as "coronary artery disease, angina, [and] anemia" with a "best estimate" of six months for the duration. (PSOF ¶ 39.) On Plaintiff's FMLA application, Plaintiff's physician noted that he "was not able" to perform the essential duties of his job from April 29, 2021 to May 3, 2021. (DSOF ¶ 25.) Plaintiff's FMLA application further noted that he might need intermittent leave approximately two times per month for his condition. (*Id.* ¶ 26.)

Plaintiff's requests for retroactive FMLA and intermittent leave were approved. (DSOF ¶ 27; PSOF ¶¶ 40, 42.) On May 10, 2021, McIntire sent an email message to Frost and Piatkowski to inform them that Plaintiff submitted a request for intermittent FMLA. (DSOF ¶ 28.) McIntire further informed them about Plaintiff's request as "standard operating procedure," advising them that they should not be surprised if Plaintiff needed to be out of work. (*Id.* ¶ 29.)

4

**C.    COVID-19's Impact on Cornerstone, Plaintiff's Furlough and Termination from Cornerstone, and Commencement of this Lawsuit**

Like most businesses, Cornerstone was adversely impacted by the COVID-19 pandemic. (*Id.* ¶ 30.) Cornerstone is in the business of moving people, and because of COVID-19, people were not moving, and the pandemic had an adverse impact on its business operations. (*Id.* ¶¶ 30-31.) Consequently, Cornerstone was forced to take cost-cutting measures, which included among many other things, layoffs and salary reductions for its employees. (*Id.* ¶ 32.) These decisions were made with input from Cornerstone's "senior leadership team," which included Piatkowski, McIntire, and Rick Ullrich ("Ullrich"), Cornerstone's VPF (collectively, the "Team"). (*Id.* ¶ 33.) The decisions were made in phases so that Cornerstone would be able to evaluate its business needs at the time. (*Id.* ¶ 34.)

When evaluating staffing needs, the Team looked at all of Cornerstone's employees and evaluated employees' span of control, caseload, salary, and Cornerstone's ability to delegate the employee's work with the least disruption to the business. (*Id.* ¶ 35.) In April 2020, Cornerstone furloughed nine employees ("First Phase"). (*Id.* ¶ 36.) Of those nine employees furloughed, two were under the age of thirty. (*Id.* ¶ 37.) For the non-furloughed employees, Cornerstone placed them in two buckets:

> Bucket 1) Salary/hours reduction - for six employees, Cornerstone implemented a 20% salary reduction and transition to a four-day workweek from April 2020 – October 2020.
>
> Bucket 2) Elimination of one pay-period - for the rest of its employees (approximately 45 total), Cornerstone eliminated one two-week pay period, resulting in a 5.8824% salary reduction.

(*Id.* ¶ 38.) Plaintiff was not furloughed at this time, and Cornerstone subsequently placed him in Bucket 1. (*Id.* ¶ 39.) As a result, Plaintiff's salary was reduced from $205,245 to $164,196.24, and he did not work on Fridays. (*Id.*)

On July 25, 2020, McIntire sent an e-mail message to Piatkowski discussing upcoming "deep pay cuts for a couple folks," and suggested to Piatkowski, "maybe it's time to cut ties with [Plaintiff] instead of cutting pay for others." (*Id.* ¶ 42.) Piatkowski responded that Plaintiff's role "needs to be eliminated and then revised to meet the current structure of the company in these unusual times." (*Id.*) By September 2020, Cornerstone started to plan for its next phase in response to COVID-19. (*Id.* ¶ 43.) So, the Team decided to make salary reductions permanent for six employees: (1) Plaintiff; (2) Laurissa Norwick (Vice President North America Operations); (3) Mark Rabe ("Rabe") (Senior Vice President, Global Development); (4) Rochelle Kretchmar (Director, Global Supply Chain Management); (5) Alicia Littlejohn (Manager, Expense Administration); and (6) Sandy Witchens (A/P Associate III). (*Id.*)

The Team started planning for its next phase of its response to COVID-19 in Spring 2021 ("Second Phase"). (*Id.* ¶¶ 44-45.) The Team made the decision to furlough three employees: (1) Plaintiff; (2) Betsy Welch ("Welch"); and (3) Rabe. (*Id.* ¶¶ 45-48.) The Team began discussions about Plaintiff's furlough in early 2021.[4] (*Id.* ¶ 48.) Specifically, on May 12, 2021, Frost sent an e-mail message to Piatkowski, Ullrich, McIntire, and Cathy Ronayne ("Ronayne"), Vice President of Info Management & Service Optimization, "in anticipation of potential role changes" which outlined the duties of Plaintiff's job to determine who would be taking over his duties. (*Id.* ¶ 49.)

---

[4] Cornerstone's decision to furlough Plaintiff, however, was made effective on June 3, 2021. (DSOF ¶ 47.)

Additionally, on May 18, 2021, McIntire sent the following e-mail message to Jason Bryant, Human Resources Director, Atlas Van Lines:

> Hi Jason –
>
> As you requested, below is a substantiation for the furlough of [Plaintiff], VP, Corporate Services:
>
> - Covid has impacted Sales including the furlough of our Sales VP, Mark Rabe. A big part of [Plaintiff]'s job is related to client and prospect contract negotiations and pricing/profit models which have diminished during COVID.
>
> - Aspects of [Plaintiff]'s job have transitioned or are in the process of transitioning to others or to Atlas (i.e., Disaster Recovery/Business Continuity).
>
> - Like Mark Rabe, [Plaintiff]'s salary was previously reduced due to COVID and lessened workload.
>
> - We do not have another suitable opening for [Plaintiff] at this time.
>
> In our on-going efforts to contain costs, we took a good hard look at all team members. At this point [Plaintiff] is the most dispensable with the least disruption to service. Additionally, he is at a higher salary and therefore the financial savings are greater.

(*Id.* ¶ 50.)

On June 2, 2021, Plaintiff was directed by his physician to commence a continuous medical leave of absence from Cornerstone because of his escalating disability symptoms. (PSOF ¶ 45.) Following his doctor's direction, Plaintiff, in the early morning hours of the following day, attempted to contact Piatkowski and McIntire to let them know his health status and the need for a medical leave of absence. (*Id.* ¶ 46.) They did not immediately answer Plaintiff's calls (*id.*), but a few hours later returned his call (*id.*). On this call, McIntire and Piatkowski advised Plaintiff that his employment was being furloughed, effective immediately, due to the "COVID downturn," and

it would last until December 6, 2021. (DSOF ¶ 51.) If Cornerstone did not recall him by the end of his furlough, Plaintiff's employment with Cornerstone would be terminated. (DSOF ¶ 51; PSOF ¶ 48.) It was after being told about the furlough that Plaintiff then advised McIntire and Piatkowski that his doctor placed him on an extended medical leave the prior day, but he did not have a chance to advise them prior to the call. (DSOF ¶ 52.) Following this call, Plaintiff memorialized their discussion in an e-mail message to Piatkowski and McIntire, indicating, "as noted on the call this morning, my doctor put me out on medical leave effective yesterday. I did not call yesterday since you were out, and I tried to call twice this morning to let you know." (DSOF ¶ 53; PSOF ¶ 49.)

During the period Plaintiff was furloughed, the Team monitored Cornerstone's financial status and did not see improvement in revenue that would justify recalling the three employees furloughed during the Second Phase: (1) Plaintiff; (2) Welch; and (3) Rabe. (DSOF ¶ 56.) Right before the end of the six-month furlough period, on November 29, 2021, McIntire sent a letter to Plaintiff advising him that his furlough would end on December 6, 2021, and at that time, his employment would be terminated. (DSOF ¶ 59; PSOF ¶ 54.) On December 10, 2021, McIntire sent an e-mail message to Plaintiff apologizing for having to send an impersonal correspondence and advised Plaintiff of his termination. (DSOF ¶ 63.)

To date, Plaintiff's role has not been replaced (*id.* ¶ 60), and Plaintiff's duties were assumed by Piatkowski, Frost, McIntire, Ullrich, and Ronayne (*id.* ¶ 61).[5] Rather, Cornerstone has hired various other employees for different roles. (*Id.* ¶ 65.) Of the nine new hires for which Plaintiff sought demographic information, seven were over the age of forty. (*Id.* ¶ 66.) Of that same group,

---

[5] Piatkowski was born in 1956 (DSOF ¶ 5); Frost was born in 1962 (*id.* ¶ 12); McIntire was born 1961 (*id.* ¶ 18); Ullrich was born in 1964 (*id.* ¶ 33); and Ronayne was born in 1975 (*id.* ¶ 49).

at the time of their hire, the two highest-paid employees were fifty-five and sixty-three years old. (*Id.* ¶ 67.)

Against that backdrop, on March 28, 2023, Plaintiff filed a Complaint against Cornerstone, alleging violations of the Americans with Disabilities Act ("ADA"), FMLA, Age Discrimination in Employment Act ("ADEA"), and New Jersey Law Against Discrimination ("NJLAD"). (Compl., ECF No. 1.) Plaintiff filed an amended complaint on July 7, 2023, alleging the same violations against Cornerstone. (Am. Compl., ECF No 12.) Following discovery, Cornerstone moved for summary judgment. (*See generally* Def.'s Moving Br., ECF No. 29-2.) Plaintiff opposed (Pl.'s Opp'n Br., ECF No. 37-2), and Cornerstone replied (Def.'s Reply Br., ECF No. 42).

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. The moving party bears the burden of showing that no genuine dispute exists such that summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine [dispute] for trial." *Id.* at 324.

9

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). Rather, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party." *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Credibility determinations are the province of the factfinder. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The court's role is "to determine whether there is a genuine [dispute] for trial." *Anderson*, 477 U.S. at 249. There can be "no genuine [dispute] as to any material fact," however, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

## III.    DISCUSSION

Cornerstone moves for summary judgment on Plaintiff's disparate treatment claims of disability discrimination in Counts I and IV and age discrimination in Counts III and IV. (*See generally* Def.'s Moving Br.) Cornerstone also moves for summary judgment on Plaintiff's retaliation claims in Counts I, II, and IV.[6]

In moving for summary judgment, Cornerstone argues that Plaintiff's disparate treatment claims fail as a matter of law because: (1) he cannot establish a *prima facie* case of disability or age discrimination; (2) it had a legitimate, non-discriminatory reason for furloughing and subsequently terminating Plaintiff; and (3) there is no evidence of pretext regarding its decision to furlough and subsequently terminate Plaintiff. (*Id.* at 6-20.) As for Plaintiff's retaliation claims,

---

[6] Cornerstone, however, does not move for summary judgment on Plaintiff's FMLA interference claim in Count II. (*See generally* Def.'s Moving Br.)

Cornerstone argues that it is entitled to summary judgment because Plaintiff cannot prove causation or pretext. (*Id.* at 21-26.)

As explained in detail below, there are genuine disputes of material fact as to Cornerstone's intent in furloughing and subsequently terminating Plaintiff. Here, based on the record, evidence and the competing testimony of the parties, a reasonable juror could conclude that Cornerstone's cost-operations measure was merely a pretextual excuse for its furlough and termination of Plaintiff based on the impermissible factors of disability and age. Accordingly, summary judgment is unwarranted.

### A.    Disparate Treatment Claims Under the ADA, ADEA, and NJLAD

First up are Plaintiff's claims of disparate treatment based on disability and age under the ADA, ADEA, and NJLAD, which center on two adverse employment actions: (1) Plaintiff's June 3, 2021 furlough; and (2) Plaintiff's related December 6, 2021 termination. (Pl.'s Opp'n Br. 6.)

All disparate treatment claims brought under the ADA, ADEA, and NJLAD, including those based on disability and age, which rely on circumstantial evidence, are controlled by the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). As such, because Plaintiff's claims rely on circumstantial evidence rather than direct evidence, the Court proceeds according to the burden-shifting framework set forth in *McDonnell Douglas. See DeSantis v. N.J. Transit*, 756 F. App'x 197, 202 (3d Cir. 2019); *Fowler v. AT&T, Inc.*, 19 F.4th 292, 298-99 (3d Cir. 2021) (analyzing disability discrimination claims under the ADA and NJLAD pursuant to the *McDonnell Douglas* framework); *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 65-66 (3d Cir. 1996) (analyzing age discrimination claims under the ADEA and NJLAD pursuant to the *McDonnell Douglas* framework).

11

The *McDonnell Douglas* framework requires that the plaintiff first establish a *prima facie* case of discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802-04. "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). "The goal at this stage is to 'eliminate . . . the most common nondiscriminatory reasons' for the defendant's actions; by doing so, the *prima facie* case creates an inference that the defendant's actions were discriminatory." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Burdine*, 450 U.S. at 254).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions. *Id.* If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation. *Id.* In the context of a summary judgment challenge, at the pretext stage of *McDonnell Douglas*, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either[:] (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (internal quotation marks omitted). To accomplish this, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (alteration in original) (internal quotations and citations omitted).

### *1.*     **Prima Facie** *Case*

The Court begins its analysis by considering whether Plaintiff established a *prima facie* case of disability and age discrimination under the ADA, ADEA, and NJLAD.

Cornerstone argues that Plaintiff's disparate treatment claims fail because he cannot establish a *prima facie* case of discrimination. (*See generally* Def.'s Moving Br.) Specifically, Cornerstone argues that Plaintiff cannot point to evidence in the record that would link his disability or age to Cornerstone's decision to furlough or terminate him. (*Id.* at 10-11.) Cornerstone further argues that "[Plaintiff] fails to show . . . that his purported [retained] comparators (Rich Ullrich, Deb Frost, Diane McIntire) are similarly situated to him." (Def.'s Reply Br. 3.)

Plaintiff, on the other hand, maintains that "Cornerstone retained [Ul[l]rich, Frost, and McIntire]" on the date of his furlough—employees that were non-disabled, sufficiently younger, or both. (Pl.'s Opp'n Br. 9-10.) Plaintiff further maintains that "Cornerstone showed a preference for hiring sufficiently younger, non-disabled employees in the seven-month period following his June 3, 2021 furlough." (*Id.* at 11.) Specifically, Plaintiff notes that "of the nine new employees hired by Cornerstone in the next seven months [after his furlough], eight were sufficiently younger than [him], and seven were non-disabled." (*Id.* at 12.)

Disparate treatment claims under the ADA, ADEA, and NJLAD generally follow the same standards. *See, e.g.*, *Lawrence*, 98 F.3d at 65 ("[D]iscrimination claims under the ADEA and [NJ]LAD are governed by the same [legal] standards and allocation of burdens of proof."); *see also Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1212 (3d Cir. 1995) ("New Jersey courts in applying the NJLAD generally follow the standards of proof applicable under the [ADA and ADEA].").

"ADA and ADEA claims differ only slightly in the elements needed to show a *prima facie* case of discrimination." *Fowler*, 19 F.4th at 299. Generally, to establish a *prima facie* case of

13

discrimination under the ADA and ADEA, a plaintiff must establish "[he] was[:] (1) [a member of a protected class, *i.e.*,] disabled (for the ADA claim) or over the age of 40 (for the ADEA claim)[;] (2) subject to an adverse employment action[;] (3) qualified for [his] position[;] and that (4) the adverse employment action was because of [his] disability (ADA) or [his] age (ADEA)." *Id.* These standards, however, differ slightly in the context of a reduction in force ("RIF"). *See Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 506 (3d Cir. 1996). In such a circumstance, a plaintiff must show: "[(1)] he was in [a] protected class[; (2)] he was qualified[; (3)] he was laid off[;] and [(4)] other unprotected workers were retained." *Id.*

Cornerstone, for purposes of the instant motion, does not dispute the first three elements. (Def.'s Moving Br. 7.) Instead, Cornerstone merely disputes the fourth element—that Cornerstone retained employees outside the protected class, *i.e.*, non-disabled or sufficiently younger employees. (*Id.*) Thus, the central issue here is whether Plaintiff satisfied the fourth prong of the *prima facie* case, that is, whether he demonstrated that individuals not within the protected class were retained.

Courts in this Circuit and in New Jersey state courts have long recognized that a "relaxed" or "modified" *prima facie* standard governs discrimination claims that arise out of a company-wide RIF. *See, e.g., Marzano*, 91 F.3d at 503 (applying New Jersey law) ("[W]e have held that . . . the *prima facie* case should be 'relaxed' when the employee's layoff occurred in the context of a [RIF]." (citation omitted)); *Baker v. Nat'l State Bank*, 711 A.2d 917, 928 (N.J. Super. Ct. App. Div. 1998) (adopting Third Circuit's modified *prima facie* standard for RIF-derived discriminatory discharge claims), *aff'd and remanded in part*, 736 A.2d 462 (N.J. 1999). In such a circumstance, a plaintiff can establish the fourth element by showing that an employee outside the plaintiff's protective class was retained, *i.e.*, employees without disabilities were retained or where

14

sufficiently younger employees were retained. *See, e.g.*, *Anderson v. CONRAIL*, 297 F.3d 242, 249-50 (3d Cir. 2002); *Showalter v. Univ. of Pitt. Med. Ctr.*, 190 F.3d 231, 234-35 (3d Cir. 1999); *Brown v. County of Passaic*, No. A-1607-12T4, 2014 WL 2533768, at *6 (N.J. Super. Ct. App. Div. June 6, 2014) ("Where an employer lays off workers and hires no replacements, it would be impossible for a plaintiff ever to satisfy the fourth prong by proving that he or she was replaced by" someone outside of the plaintiff's protected class "or, for that matter, by anyone else."); *Marzano*, 91 F.3d at 503 ("[In the RIF context,] it is sufficient [for a plaintiff] to show that he was discharged, while the [employer] retained someone [outside the protected class]." (citation omitted)). Along the same lines, in the RIF context, a plaintiff need not show that "similarly situated" employees in *similar roles* were retained but need only show that employees were retained outside their protected class. *Marzano*, 91 F.3d at 510 (explaining that "similarly situated" employees in *similar roles* need not be established, but such facts may strengthen a plaintiff's case in the RIF context).

Here, mindful that Plaintiff's burden is "not intended to be onerous[,]" *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), the Court finds that Plaintiff's showing is sufficient to state a *prima facie* case for his disability and age discrimination claims. Specifically, Plaintiff has demonstrated that Cornerstone retained at least one employee outside of his protected classes—disability and age—and thus finds that summary judgment is inappropriate at this stage.

Beginning with Plaintiff's disability disparate treatment claims, Plaintiff points to Piatkowski, Ullrich, Frost, and Ronayne. (Pl.'s Opp'n Br. 10.) All are non-disabled and were retained after Plaintiff's furlough. (*Id.*) Defendant, however, argues that Plaintiff fails to show that "the retained employees [Piatkowski, Ullrich, Frost, and Ronayne] were similarly situated to him." (Def.'s Reply Br. 4.) In other words, Plaintiff fails to show that the retained employees had a

similar role as Plaintiff. (*See id.*) Defendant's argument, however, misses the mark. Plaintiff's duties were assumed by these retained employees, and his role has not been replaced. (DSOF ¶ 60; Pl.'s Opp'n Br. 10.) Indeed, Plaintiff need not show that employees were similarly situated in *similar roles* to establish a *prima facie* case in the RIF context. *Marzano*, 91 F.3d at 503 (rejecting defendant's argument that plaintiff needed to show that retained employees in a RIF case had similar roles to plaintiff and outside plaintiff's protective class); *see also Baker*, 711 A.2d at 928 ("[A] plaintiff whose position was eliminated need not show that he or she was replaced, but must show that the employer retained someone outside the protected class."). As such, because Plaintiff established that Cornerstone retained employees outside of Plaintiff's protective class, Plaintiff has made out a *prima facie* case as to his disability discrimination claims.

Turning to Plaintiff's age discrimination claims, Plaintiff points to Ronayne and Ullrich as the retained employees who were sufficiently younger. (Pl.'s Opp'n Br. 9.) At the time of Plaintiff's furlough, Ronayne was forty-six years old, and Ullrich was fifty-seven years old. (*Id.*) So, Ronayne is eighteen years younger than Plaintiff, and Ullrich is seven years younger than Plaintiff. The Third Circuit has found these age gaps to be sufficient to satisfy the fourth element of a *prima facie* case of age discrimination in the context of a RIF. *Sempier*, 45 F.3d at 729 (recognizing that there is no "particular age difference that must be shown[, but while d]ifferent courts have held . . . that a five year difference can be sufficient . . . a one year difference cannot") (citation omitted); *see also Showalter*, 190 F.3d at 236 (noting the Third Circuit's recognition in *Sempier* and holding that an eight-year age difference satisfies the fourth prong). As such, because Plaintiff has established that Cornerstone retained employees sufficiently younger, Plaintiff has made out a *prima facie* case as to his age discrimination claims.

16

Viewing the record as a whole, there is sufficient evidence to conclude that Cornerstone's decision to furlough and subsequently terminate Plaintiff amounted to an adverse employment action because of his protected status and thus could permit a reasonable jury to infer causation between Plaintiff's protected class and the adverse employment action. The Court, therefore, finds that Plaintiff has raised sufficient evidence to make out a *prima facie* case of disability and age discrimination through disparate treatment. *See Sempier*, 45 F.3d at 728 ("The *prima facie* case merely 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'") (citation omitted); *see also Ezold v. Wolf Block*, 983 F.2d 509, 523 (3d Cir. 1993) ("Because the *prima facie* case is easily made out, it is rarely the focus of the ultimate disagreement.").

### 2.    Pretext

Because the parties do not dispute Cornerstone's ability to articulate a legitimate, non-discriminatory reason for Plaintiff's termination, the Court arrives to the third and final stage of the *McDonnell Douglas* framework and considers whether Plaintiff can establish that Cornerstone's reason for terminating him were pretextual.

According to Cornerstone, Plaintiff was furloughed and subsequently terminated because its decision to do so was one, among many other, cost-cutting measures after Cornerstone was adversely impacted by the COVID-19 pandemic. (Def.'s Moving Br. 13.) Cornerstone further maintains that its decision to do so was made prior to Plaintiff's FMLA request, and, therefore, its decision to furlough and terminate him could not have been based on his protected class. (*See generally id.*) Plaintiff, on the other hand, argues that Cornerstone's reason for his furlough and termination is pretextual because it is false and "discovery has revealed material inconsistencies

with respect to Cornerstone's decision makers, reasons, and timing (the 'Who, What, and When') related to the furlough and termination decisions." (Pl.'s Opp'n Br. 16-17.)

For Plaintiff to meet his burden at the pretext stage, he "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either[:] (1) disbelieve [Cornerstone's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivation or determinative cause of [Cornerstone's] action." *Fuentes*, 32 F.3d at 763. Stated differently, "to avoid summary judgment, [Plaintiff's] evidence rebutting [Cornerstone's] proffered legitimate reason[] must allow a fact-finder reasonably to infer that . . . [Cornerstone's] proffered . . . reason [] was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008), *order clarified*, 543 F. 3d 178 (3d Cir. 2008). Indeed, "'[i]n the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine [dispute] of fact regarding pretext.'" *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 544 (D.N.J. 2022) (citation omitted).

"To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence," and thus "infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (internal quotation marks and citations omitted).

18

Here, the Court finds that Plaintiff has proffered enough evidence demonstrating that there are outstanding genuine disputes of material fact which, if accepted by a jury, could ostensibly lead it to question Cornerstone's motivations or stated reasons for termination. Put simply, Plaintiff has offered evidence that rebuts Cornerstone's proffered reason for terminating him.

To begin, Plaintiff points to evidence that could contradict Cornerstone's assertion that it struggled financially in 2021. Specifically, Plaintiff offers evidence that Cornerstone hired six new employees during Plaintiff's furlough period, casting doubt on Cornerstone's explanation that Plaintiff was terminated as a cost-cutting measure brought on by the negative financial effects of the COVID-19 pandemic on its business. During Plaintiff's furlough period, Cornerstone hired the following employees: (1) Dawn Farrell ($70,000); (2) Lisa Baidwan ($100,000); (3) Maria Koenitzer ($70,000); (4) Lawrence Brouder ($195,000 + sales incentives); (5) Wei Tay ($76,800 + 13-month bonus); and (6) Julie Lewis ($27.40/hour). (PSOF ¶¶ 65-66.) The total of the combined added salaries equates to approximately $575,792. (*Id.*) From Plaintiff's furlough period to his termination, Cornerstone furloughed only three employees: Plaintiff, Welch, and Diana Tsymbalyuk ("Tsymbalyuk"). (*Id.* ¶ 68.) At the time of their respective furloughs, these individuals earned $169,950 (Plaintiff), $140,000 (Welch), and Tsymbalyuk ($75,000) annually, for an approximate total of $384,950. (*Id.*)

Plaintiff also points to Cornerstone's Earnings Before Interest and Taxes ("EBIT") plan, which is the best measure of its profitability for any given time in the year. (PSOF ¶ 75 (quoting Piatkowski Dep., at 88:19-89:5 ("Q. What is the most important number or aspect of this forecast document to you as the CEO of Cornerstone? A. Plan versus actual and our EBIT, bottom line. Q. Now "EBIT" is earnings before income and taxes; right? A. Yup. Q. We talked about how that's the best measure of the company's profitability at this snapshot in time; correct? A. Correct.")).)

On May 6, 2021, the day Plaintiff requested intermittent FMLA leave, Piatkowski reviewed the monthly financial performance of the company, which showed an increase in revenue and EBIT numbers at that snapshot in time. (PSOF ¶ 84 (citing Ex. 26, 5/6/21 Financial Performance of Cornerstone, CS-000561-000570); Piatkowski Dep., at 94:24-96:8 (testifying that she reviewed this document on May 6, 2021, in the ordinary course of business).) Specifically, the May 6, 2021 financials showed that the projected annual EBIT at that time was $1,274,731, which exceeded its plan (or goal) annual EBIT of $1,019,941 by $254,790. (*Id.* ¶ 85.)

Next, Plaintiff points to evidence that demonstrated "inconsistent explanations of why [Cornerstone] fired [him]," which could establish pretext. *Cullen v. Select Med. Corp.*, 779 Fed. App'x 929, 932 (3d Cir. 2019) ("In its interrogatory responses, [the employer] said his performance was a factor. Yet [the alleged decision-makers], testified that it was not . . . [The employer's] explanations for [the plaintiff's] firing were varied enough to undermine its legitimate, non-discriminatory reason for his termination."); *see also Abramson v. William Paterson Coll.*, 260 F.3d 265, 283-85 (3d Cir. 2001); *Arpajian v. Prop. Sols., Inc.*, No. 03-4666, 2005 WL 2000172, at *10 (D.N.J. Aug. 16, 2005) ("Shifting explanations for an employment action is one of the strongest types of evidence of pretext.") (citation omitted).

First, Plaintiff identified inconsistencies in *who* made the decision to terminate Plaintiff. In Cornerstone's interrogatory answers, Cornerstone identified Piatkowski as the sole decision-maker, with Frost giving her "input" on the decision. (*See* Ex. 19, Def.'s Resp. to Pl.'s Interrog. No. 2.) But Piatkowski testified that she was not the only decision-maker and added three others: Ullrich, Frost, and McIntire. (Piatkowski Dep., at 30:6-17 ("Q. Did any -- was anyone else involved, on behalf of Cornerstone, as a decision maker with regard to the furlough of [Plaintiff]? A. Yes. Q. Who else? A. Rick Ullrich; . . . Debra Frost; Diane McIntire.").) McIntire, however,

testified that she was not, in fact, a decision-maker and that only Piatkowski and Frost served in that role. (McIntire Dep., at 32:25-34:9.) Like McIntire, Frost testified that she was not, in fact, a decision-maker despite Piatkowski and McIntire testifying to the contrary. (Frost Dep., at 60:2-5 ("Q. But in terms of making the decision to furlough Mr. Jenkins, you were not a decision-maker in that regard? A. Correct.").)

Second, Plaintiff identified inconsistencies in Cornerstone's explanation as to *why* he was furloughed. Cornerstone generally explained its reasoning through documentary evidence for its furlough as a cost-cutting measure prompted by the negative impact of the COVID-19 pandemic on its business. (PSOF ¶ 98.) But, when deposed, Piatkowski, McIntire, and Frost each provided an additional reason: Plaintiff's alleged poor job performance in his role as VPCS. (PSOF ¶ 105 (quoting McIntire Dep., at 36:23-37:9 ("Q. Was performance a factor? His – [Plaintiff's] job performance, was that a factor in the furlough decision? A. Yes. Q. In what regard? A. Any time we're making a staffing decision, we certainly look at someone's performance. That basically says it all. Q. Okay. And what was his -- how was he -- how was he performing at that time, if you can recall? A. He was not performing well.")); Piatkowski Dep., at 35:3-16; 31:5-18 ("Q. Any other reasons besides the one -- the ones you've just described as far as Cornerstone's basis for furloughing [Plaintiff's] employment on June 3rd, 2021? A. Not that I can recall. Q. Was his performance a factor in that decision? A. Yes. Q. And how so? A. For the reasons we just described, there were issues with some of his work."); Frost Dep., at 61:1-16.)

Third, Plaintiff has pointed to evidence that demonstrates inconsistencies regarding *when* Cornerstone made the decision to terminate Plaintiff. Specifically, Cornerstone initially indicated in its interrogatory answers that the decision to terminate Plaintiff's employment was made on May 18, 2021. (Ex. 19, Def.'s Resp. to Pl.'s Interrog. No. 4.) When deposed, McIntire testified

that the decision was not made until November 2021. (*See* McIntire Dep., at 160:11-162:10.) Even further, discovery revealed that Cornerstone had an internal e-mail message dated May 12, 2021 regarding the reassignment of Plaintiff's job duties post-furlough. (DSOF ¶ 117 (citing Ex. 30, 5/12/21 Email Thread, CS-000319-000321).) This same e-mail message was corroborated by McIntire's testimony. (McIntire Dep., at 98:10-16 ("Q. Okay. Let me ask you just high level generally, [what] was this email chain about? A. [Plaintiff]'s duties and reassignment of them if he were not with the company. Q. Okay. And this email chain, if you will, began on May 12th, 2021, correct? A. Yes.").)

As such, the Court finds that there is sufficient evidence in the record for Plaintiff to show that Cornerstone's legitimate, non-discriminatory reason for terminating Plaintiff was pretextual. While there is evidence to support Cornerstone's position that Plaintiff was indeed selected as part of a standard RIF process, Plaintiff's evidence could potentially discount or contradict Cornerstone's proffered rationale for its selection of Plaintiff. *See Lynn Lafiandra v. Accenture, LLP; Barbara Harvey; Francis Hintermann*, No. 23-3050, 2024 WL 5116955, at *4 (3d Cir. 2024) ("The inconsistency of [the employer's] proffered explanations for [plaintiff's] termination is probative of pretext."). For these reasons, and for those stated further above, summary judgment as to Plaintiff's disparate treatment discrimination claims is denied.

B.      **Retaliation Claims Under ADA, NJLAD, and FMLA**

Next up are Plaintiff's claims of unlawful retaliation in violation of the ADA, NJLAD, and FMLA.[7]

Similar to Plaintiff's disparate treatment claims, Plaintiff's retaliation claims adhere to the *McDonnell Douglas* framework and have overlapping elements. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012) (analyzing ADA, NJLAD, and FMLA retaliation claims pursuant to the *McDonnell Douglas* framework).

*1.*     **Prima Facie** *Case*

To establish a *prima facie* case of disability-accommodation retaliation under the ADA, a plaintiff must show that: (1) he engaged in a protected activity in the form of requesting disability accommodations; (2) the employer subjected him to an adverse employment action; and (3) a causal connection exists between the protected activity and the challenged adverse action. *Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 41 (3d Cir. 2018). Similarly, to establish a *prima facie* case of FMLA retaliation, a plaintiff must prove that he: "(1) invoked [his] right to FMLA-qualifying leave; (2) suffered adverse employment decisions; and (3) the adverse actions were causally related to [his] invocation of rights." *Lichtenstein,* 691 F.3d at 302. Here, Cornerstone concedes the first two elements of both retaliation claims and only challenges the final element of both claims—causation.

To demonstrate the third element of a *prima facie* case for retaliation claims, Plaintiff "must point to evidence sufficient to create an inference that a causative link exists between [his] FMLA leave and [his] termination." *Id.* at 307 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271,

---

[7] Like disparate treatment claims, retaliation claims asserted under the NJLAD adhere to the same legal standards as retaliation claims asserted under the ADA. *Abrams*, 50 F.3d at 1212.

279-81 (3d Cir. 2000)). "Generally, an employee demonstrates retaliatory animus by showing either an unusually suggestive temporal proximity between the employee's protected activity and the employer's adverse action, or a pattern of antagonism in the period between the protected activity and the adverse action." *Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 717 (E.D. Pa. 2021) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (parenthetical omitted)). And "temporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 n.9 (3d Cir. 2003)). For temporal proximity to be sufficient on its own, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* The employer's inconsistent reasons for the adverse action can also be used to show causation at the *prima facie* stage. *See, e.g.*, *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 234, n.10 (3d Cir. 2007); *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017); *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986).

Here, the Court finds that Plaintiff has made out a *prima facie* case of retaliation. Plaintiff requested a disability accommodation in the form of intermittent leave on May 6, 2021. (*See* Ex. 12, Email Thread, CS-0000257.) Six days later, on May 12, 2021, an e-mail message was started regarding the reassignment of Plaintiff's job duties. (Ex. 30, 5/12/21 Email Thread, CS-000319-000321.) McIntire testified about the nature of the e-mail chain as being about "[Plaintiff's] duties and reassignment of them if he were not with the company." (McIntire Dep., at 98:10-16.) Plaintiff further points out that Cornerstone "swore in interrogatory answers that it made the decision to terminate [his] employment on May 18, 2021, only 12 days after [he]

requested FMLA." (Pl.'s Opp'n Br. 37-38 (citing Ex. 19, Def.'s Resp. to Pl.'s Interrog. No 4).) Based on the foregoing, the Court finds that Plaintiff has provided sufficient evidence to establish temporal proximity. *See, e.g., Fasold v. Just.*, 409 F.3d 178, 190 (3d Cir. 2005) (holding that a period of about three months between protected activity and adverse action gives rise to an inference of retaliation); *Santosuosso v. NovaCare Rehab.*, 462 F. Supp. 590, 598 (D.N.J. 2006) (finding temporal proximity of "a little more than a month" creates an inference of discrimination); *Dinger v. Bryn Mawr Tr. Co.*, No. 19-2324, 2022 WL 6746260, at *10 (E.D. Pa. Oct. 11, 2022) (finding temporal proximity of twenty-eight days is unusually suggestive); *Taylor v. JFC Staffing Assocs.*, 690 F. Supp. 357, 371 (M.D. Pa. 2009) (concluding that a twelve-day gap between plaintiff's protected activity and adverse action was "sufficiently 'unusually suggestive'" to infer causal connection); *Burgess-Walls v. Brown*, No. 11-275, 2011 WL 3702458, at *8 (E.D. Pa. Aug. 22, 2011) (holding that a gap of twelve to forty-two days between plaintiff's complaint and her demotion was sufficient to establish causation). The Court, therefore, finds that a reasonable factfinder, considering the evidence as a whole, could conclude that Plaintiff's furlough was causally connected to Plaintiff's requests for and receipt of disability accommodations.[8]

### 2.    *Pretext*

Because the Court's pretext inquiry for retaliation claims is identical to the analysis for disparate treatment claims, *Lichtenstein*, 691 F.3d at 301-02, the Court relies on its pretext analysis of Plaintiff's disparate treatment claims above. As such, because there are genuine disputes of

---

[8] The Court also notes that an inference of causation may be appropriate when an "employer [has given] inconsistent reasons for terminating the employee." *Farrell*, 206 F.3d at 281. Here, documentary evidence demonstrated that Cornerstone's proffered reason for termination was cost-cutting, but testimony suggested that Plaintiff's performance played a role. *See Lynn Lafiandra*, 2024 WL 5116955, at *4 (finding that inconsistent reasoning for discharge was sufficient to establish the causation element of plaintiff's *prima facie* case of disability retaliation).

material fact as to whether Plaintiff was retaliated against for his requests for accommodation, summary judgment will also be denied as to Plaintiff's retaliation claims under the ADA, FMLA, and NJLAD.

## IV.    **CONCLUSION**

For the foregoing reasons, Cornerstone's Motion for Summary Judgment is denied. The Court will issue an order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

26